**Elbert G. GREEN and Robert Danley, Individually and as representatives of persons similarly situated**

v.

**UNITED STATES STEEL CORPORATION.**

Civ. A. No. 76–3673.

United States District Court, E.D. Pennsylvania.

Aug. 1, 1986.

Richard Z. Freemann, Creed Black, Mark Stewart, Philadelphia, Pa., for plaintiffs.

Thomas Preston, Robert Talley, Philadelphia, Pa., for defendant.

CONTENTS

|  | | Page Nos. |
|---|---|---|
| FINDINGS OF FACT | | 1525 |
| I. | Stipulated Framework for Assessment of Damages | 1525 |
| II. | 1972 and 1973 Summer Applicants | 1527 |
| III. | Decertification Notice in Dickerson | 1527 |
| IV. | USS Employee Reference Group | 1527 |
| V. | Fringe Benefits | 1529 |
| A. | Insurance | 1533 |
| B. | Pension | 1534 |
| C. | Social Security | 1535 |
| D. | Workmen's Compensation | 1536 |
| E. | Unemployment | 1537 |
| F. | Supplement Unemployment | 1538 |

## 1524

## CONTENTS

| | | Page Nos. |
|---|---|---|
| FINDINGS OF FACT | | |
| VI. | Mitigation of Wages and Fringe Benefits | 1539 |
| | A. Mitigation Concept | 1539 |
| | B. The Killingsworth Studies | 1540 |
| | C. The Siskin Studies | 1544 |
| | D. Damages Calculation and Recapitulation | 1547 |
| VII. | Front Pay | 1548 |
| VIII. | Tax Consequences of Damage Award | 1549 |
| IX. | Prejudgment Interest | 1549 |
| X. | Injunctive Relief | 1550 |
| XI. | Costs | 1553 |
| CONCLUSIONS OF LAW | | 1553 |

## MEMORANDUM

NEWCOMER, District Judge.

On July 18, 1983 this Court held that defendant United States Steel Corporation (USS) violated Title VII by engaging in race discrimination against the class of black applicants who unsuccessfully sought employment in the production and maintenance department (P & M) at the USS Fairless Hills Plant during the following two periods: July 11, 1972 through December 31, 1974, and January 1, 1978 through December 31, 1979 (the "class period"). *Green v. United States Steel Corp.*, 570 F.Supp. 254 (E.D.Pa.1983) (liability opinion).[1] At the liability stage, plaintiffs proved, through the use of statistical evidence, that USS failed to hire black applicants in proportion to their percentage in the applicant pool, and that this failure had a discriminatory impact on blacks. This Court found that USS, in its hiring procedures, relied on an amalgam of largely subjective criteria, and its interviewers were not trained so as to ensure even-hand-

ed application of the procedures. *Id.* at 260. Moreover, the minimum hiring criteria for P & M positions were so low that they did not eliminate many applicants.[2]

The liability opinion explicates in great detail this Court's findings and the reasons therefore, and I incorporate it as if set forth herein. Only those portions essential to an understanding of this opinion will be repeated when necessary.

Following the liability opinion, the Court directed the parties to meet, identify issues pertinent to relief, and develop any information necessary to calculate the damages to be awarded to the class. Order of January 12, 1984.

The parties were able to agree on a basic framework, to compile a stipulated set of damages calculations (Ex. P–200), and to focus on the several remaining contested legal issues.

Both sides fully briefed the following issues, now ripe for this Court's disposition:

1. Plaintiffs also sought to hold defendant liable under § 1981, and under a theory of class-wide disparate treatment under Title VII, but this Court found no evidence of intentional discrimination in violation of 42 U.S.C. § 1981 nor sufficient evidence to make out a *prima facie* case of class-wide disparate treatment under Title VII. 570 F.Supp. at 277–78.

Initially the certified class period ran from July 11, 1972 through December 31, 1981. However, the years 1975, 1980 and 1981 were excluded from consideration during the liability trial, because "very little hiring was done for P & M jobs at Fairless Hills" during those years. 570 F.Supp. at 257. The years 1976 and 1977 were also excluded, because in those years USS hired blacks at levels close to or exceeding their representation in the applicant pool. *Id.*

2. "Anyone hired had to be at least 18 years old, pass a physical examination, and be able to read safety signs...." *Id.* at 257.

1. Whether applicants for summer positions in 1972 and 1973 are included in the class.

2. Whether the decertification notice sent in *Dickerson* precludes unsuccessful black applicants in 1972, 1973 and 1974 from recovering damages in *Danley*.

3. The proper USS employee reference group to use to compute back pay and attrition rates.

4. Which fringe benefits, if any, should be included in a back pay award.

5. The appropriate method for calculation of mitigation of damages (interim earnings).

6. Whether USS should be given a "credit" for those years in which they did not discriminate against, black applicants.

7. Whether plaintiffs are entitled to front pay, and if so, how it should be calculated.

8. Whether plaintiffs are entitled to prejudgment interest, and if so, how it should be computed.

9. Whether plaintiffs are entitled to any additional monetary compensation to account for the tax effect of lump sum payments.

10. Who should bear the costs relating to the distribution of damages (including the cost of notice to the class members).

11. Whether plaintiffs are entitled to injunctive relief and, if so, how it should be fashioned.

The parties also presented testimony, documents and arguments to the Court at the damages trial held April 7–14, 1986. This Memorandum Opinion shall constitute the Court's findings of fact and conclusions of law, as required by Fed.R.Civ.P. 52(a).

FINDINGS OF FACT

I. *Stipulated Framework for Assessment of Damages*

1. A central purpose of Title VII is "to make persons whole from injuries suffered on account of unlawful employment discrimination." *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 763, 96 S.Ct. 1251, 1264, 47 L.Ed.2d 444 (1976) (*citing*

*Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975)).

2. Title VII gives district courts significant latitude to "order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay ... or any other equitable relief as the court deems appropriate." 42 U.S.C. § 2000e–5(g).

3. The goal at the damages stage is to award plaintiffs complete relief in order to make them whole, while at the same time not awarding plaintiffs damages which will punish defendant or give plaintiffs a windfall.

4. The assessment of damages has been facilitated by numerous factual and legal agreements reached by the parties before trial. The Court finds these agreements, noted and summarized below, to afford a fair and reasonable approach to the calculation of damages owed the plaintiff class.

5. USS conceded that back pay was an appropriate element of damages due the plaintiff class, and that this component "should be based upon the average annual wages earned by persons who were actually hired by USS in each of the liability periods." (Ex. P–200, Section IV at 11).

6. The Court finds it reasonable to calculate back pay in this fashion because, by definition, the plaintiff class was not hired by USS and therefore does not have an employment history at USS.

7. Moreover, the liability period spans almost ten years, the number of class members (approximately 13,000) greatly exceeds the jobs available even in the absence of discrimination (386). The subjective nature of the hiring criteria as employed by untrained interviewers, formed the factual basis for the liability opinion. 570 F.Supp. at 260, 269. Hence it is not practical to attempt to identify which members of the plaintiff class would have been hired but for the defendant's race discrimination.

8. Because the calculation of damages on an individual basis is not a feasible way to proceed, the parties have stipulated that damages should be calculated and distributed on a class-wide basis. (Ex. P–200 at 1). This approach has been adopted by other courts. *See, e.g., Hameed v. International Ass'n of Bridge Workers, Local 396,* 637 F.2d 506 (8th Cir.1980); *Stewart v. General Motors Corp.,* 542 F.2d 445, 452 (7th Cir.1976), *cert. denied,* 433 U.S. 919, 97 S.Ct. 2995, 53 L.Ed.2d 1105 (1977); *Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211, 261 (5th Cir.1974) ("[W]hen the class size or ambiguity of promotion or hiring practices or the multiple effects of discriminatory practices or the illegal practices continued over an extended period of time calls forth the quagmire of hypothetical judgment ... a class-wide approach to the measure of back pay is necessitated").

9. The basic approach used to measure the plaintiffs' damages has been to ascertain how many class members would have been hired in each liability period in the absence of discrimination (the Black Hiring Shortfall); compute the value of wages and fringe benefits those persons would have received each year from USS; and determine the amounts of wages and fringe benefits those persons could be expected to have earned each year at other jobs after not being hired by USS. The annual excess of USS wages and fringe benefits over outside wages and fringe benefits is the net damages lost that year.

10. There are five liability periods; July-December 1972, and all of 1973, 1974, 1978 and 1979. 570 F.Supp. at 257, 263. Damages are calculated separately for each group of blacks who should have been hired during each liability period (*i.e.,* for each of the five "year class" cohorts), and for each such cohort to make damages calculations on a yearly basis, commencing with the year they should have been hired through the end of 1985. (Ex. P–200).

11. There were hiring shortfalls for permanent jobs in all five liability periods. Summer hiring shortfalls occurred in 1972 and 1973.

12. The annual shortfall figures were obtained by subtracting the actual number of blacks hired by USS as P & M employees in each liability period from the number of blacks who should have been hired in that liability period, had black applicants been hired in proportion to their representation in the applicant pool. The latter number was derived by multiplying the total number of USS hires in a liability period by the percentage of blacks then in the applicant pool.

13. This formula is in accord with this Court's liability ruling that, absent discrimination, blacks would have been hired by USS in proportion to their representation in the applicant pool.

14. The aggregate USS Black Hiring Shortfall, including both permanent and summer jobs, is 386 persons. (Ex. P–200, Section II).

a. The Black Hiring Shortfall for permanent jobs in each liability period is as follows:

| | | |
|---|---|---|
| 1972 | — | 19 people |
| 1973 | — | 101 people |
| 1974 | — | 82 people |
| 1978 | — | 74 people |
| 1979 | — | 52 people |
| TOTAL | — | 328 people |

b. The Black Hiring Shortfall for summer jobs in the pertinent liability periods is as follows:

| | | |
|---|---|---|
| 1972 | — | 6 people |
| 1973 | — | 52 people |
| TOTAL | — | 58 people |

15. The Black Hiring Shortfall for the summers of 1972 and 1973 are "borrowed" from the figures for permanent employees for those years because the summer applications for 1972 and 1973 were destroyed.

16. The Black Hiring Shortfall is adjusted in each year subsequent to the year that a cohort class would have been hired, to reflect actual attrition by USS employees in the P & M department. This ensures that damages are not paid for employees who would no longer be employed by USS in the

normal course of events (*i.e.* even in the absence of discrimination). (Ex. P–200, Section III).

17. The attrition rates for P & M employees at USS were calculated and set forth separately in the Stipulated Damages Figures for white USS employees, black USS employees and all USS employees hired during the liability periods. (Ex. P–200, Section III).

## II. *Whether Summer Applicants for 1972 and 1973 Are Included in the Class*

18. Fifty-eight people comprise the Black Hiring Shortfall for the summers of 1972 and 1973. The class certified by Order dated August 16, 1982 consisted of:

All black persons who unsuccessfully sought employment at the Fairless Hills Plant of United States Steel Corporation between July (11), 1972 and the present.

570 F.Supp. at 256.

19. At the liability trial, the plaintiff class refined its liability periods of proof to exclude 1975–1977, 1980 and 1981. *See* note 1, *supra.*

20. At no time were the 1972 and 1973 summer applicants excluded, and in fact several references to summer applicants, in combination, support the inclusion of 1972 and 1973 summer applicants. *See* Findings of Fact Nos. 16, 23, 83, 123 and 128 ("Moreover, [Talley's] figures do not include applications submitted by persons seeking summer jobs, although they are members of the class."); Conclusions of Law Nos. 4–6 (summer hires included for the liability years; this Court explicitly excluded any portions of the certified class and unsuccessful theories in the liability opinion's conclusions of law).

## III. *Decertification Notice in Dickerson and its Effect, if any, on the 1972–1974 Members of the Danley Class*

21. The Court incorporates by reference as if set forth herein the Memorandum and Order of March 31, 1981, where this Court addressed this issue and found that, based on the timely filing of the *Danley* action after the *Dickerson* notice became effective, the 1972, 1973 and 1974 unsuccessful applicants are included in the *Danley* class.

## IV. *The Proper USS Employee Reference Group For Computation of Back Pay and Attrition Rates*

22. There is an unexplained disparity between USS wages paid to white employees and black employees during the liability years. (Ex. P–200, Section IV).

23. Plaintiffs advocate using white USS employees as the reference group for measuring back pay, on the grounds that: white applicants took the place of those black applicants who were not hired by USS; and if white USS employees do not provide the reference group, then the class members will be penalized twice—once for not being hired, and again in computation of damages.

24. While plaintiffs' position has some initial appeal, upon closer inspection their position is flawed. There was no evidence from which I could reasonably conclude that the acknowledged wage disparity resulted from discrimination against black employees, once hired at the Fairless Hills plant.

25. Defendant takes the position that the black USS employees are the proper reference group, as the group "having employment characteristics most closely resembling those of plaintiffs and who were actually hired at that facility." Defendant's trial brief at 14.

26. This argument is inherently offensive, as plaintiffs point out, because the suggestion is that black employees perform like one another simply because they are black. The racial composition of a group of workers is not a legitimate "employment characteristic" upon which this Court may rely.

27. The Third Circuit has not yet been faced with the situation presented here, nor even with an analogous problem. The cases relied upon by both parties (from

other circuits) do not provide much guidance in this area and thus I am faced with a novel issue.

28. With the exception of one case cited, plaintiffs cite cases which are inapposite because the cases involve *individual* calculations and/or discrimination in *post-hiring* employment practices (training, promotion, etc.).

29. These cases are not persuasive precedent because those courts usually had prior work histories with the employment characteristics for the class members involved. Also in measuring damages for one individual, a personal history could be obtained to find the closest match with another employee.

30. For example, plaintiffs cite to *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211 (5th Cir.1974), a class action suit involving discrimination by a cast iron and pipe manufacturer in its promotion practices. *Id.* at 217 & n. 5. There the court instructed the trial court, on remand, to assess back pay damages on a class-wide basis. In response to a suggestion by the Equal Employment Opportunity Commission (EEOC), the *Pettway* court recommended use of a class-wide formula " 'based upon a class of *whites* which would be comparable to the members of the effective class but for the discrimination,' " *id.* at 263 (emphasis supplied), because this method takes into account "actual *advancement* of a comparable group not discriminated against." *Id.* (emphasis supplied). Here there is no evidence of racial discrimination in post-hiring employment practices.

31. Individual advancement at USS is highly dependent upon such employment factors as overtime and individual incentive. Thus, in the absence of any evidence of racial discrimination in USS post-hiring employment practices, I cannot find it equitable or a good "match" to use white USS employees as the reference group.

32. Plaintiffs also rely on the Seventh Circuit case of *Stewart v. General Motors Corp.*, 542 F.2d 445 (7th Cir.1976), *cert. denied* 433 U.S. 919, 97 S.Ct. 2995, 53 L.Ed.2d 1105 (1977), for the proposition that in a Title VII class discrimination suit alleging racial discrimination in *hiring and promotion* at one of defendant's plants, white employees were the proper reference group for back pay.

33. The *Stewart* court, in its opening paragraph, describes the case as one "concern[ing] claims of racial discrimination in *hiring and promotion* against General Motors Corporation at its Broadview, Illinois Parts Distribution Center" by a class of "black people who have been employed at this facility in hourly rated positions since December 21, 1983." *Id.* at 449 (emphasis supplied). However, a close reading of *Stewart* reveals that the suit deals only with discrimination in two types of promotions, and not at all with hiring practices. Consequently, when the court recommends use of white employees as the reference group for a class-wide remedy, this suggestion encompasses a need to remedy racial discrimination against class members already hired by the defendant. *See* 542 F.2d at 453.

34. One case has advocated the use of whites as the reference group in a suit claiming racial discrimination in hiring, where the damages were calculated on a class-wide basis. *Hameed v. International Ass'n of Bridge Workers, Local 396*, 637 F.2d 506 (8th Cir.1980).

35. In *Hameed,* blacks were denied entry into ironworkers apprenticeship programs from 1965–1973. Liability in *Hameed* was based on a disparate impact theory and the court calculated damages using the Black Hiring Shortfall model. In explaining to the district court its task for back pay computation, the *Hameed* court described back wages using *white* apprentices admitted to the program. *Id.* at 520–521. *Hameed* cites, *inter alia,* to *Stewart, supra,* for guidance in its formulation of class-wide apportionment of damages. Nowhere does the Court in *Hameed* explain why whites are chosen as the reference group. At best, it appears that the court did not reflect upon the issue of a reference group at all but rather, using *Stewart*

as a model, assumed that white employees provided the correct reference group.

36. In the beginning of its back pay discussion the *Hameed* court set out the three issues of concern. *Id.* at 519. None of the three relates to which reference group is appropriate. Instead the court addresses the issues of class-wide versus individualized calculations, determination of the Black Hiring Shortfall, and a method to identify class members entitled to relief. *Id.*

■ 37. Individual vicissitudes of employment earnings are too great to award the plaintiff class the highest back pay award available for workers in their putative division. I therefore find that the most equitable choice of employees for back pay (and as a corollary matter, attrition rates) is all USS P & M employees for the class periods (Ex. P.200, Section IV). I recognize, as I must, that taking the whole universe of P & M employees remains, at best, an imperfect fit, but it is the best choice in this case. As previous courts have frankly stated in cases involving a class-wide determination of back pay "[a]ny method is simply a process of conjectures." *Stewart, supra,* 542 F.2d at 453 (*citing Pettway, supra,* 494 F.2d at 261).

38. The USS wages lost by the class members and calculated by reference to the Black Hiring Shortfall (386 persons) is determined as follows: On a yearly basis the aggregate wages USS paid to *all* employees actually hired as P & M laborers in each liability period is divided by the number of P & M laborers working for USS in the given year. This yields average annual per capital wages at USS for each year within each liability period. These average amounts are then adjusted for attrition (using the attrition rates of all USS P & M employees at Fairless Hills), to reflect what the Black Hiring Shortfall (386 people) would have earned while working at USS through December 1985 (Ex. P-200, Section IV).

39. The average earnings are calculated for each entering class year, or cohort, on a yearly basis, by multiplying the Black Hir-

ing Shortfall for each cohort in a given year by the average yearly earnings per capita. Each year the Black Hiring Shortfall is reduced to reflect attrition.

40. Using the tables from the Stipulated Damages Figures (Ex. P–200, Section IV) with all USS employees as the reference group, yields USS wages for the Black Hiring Shortfall in the following amounts:

a. Permanent Jobs

| Year of Hire | Average Earnings for All USS Employees |
|---|---|
| 1972 | $ 1,470,714 |
| 1973 | 7,341,084 |
| 1974 | 5,627,332 |
| 1978 | 4,153,546 |
| 1979 | 1,414,712 |
| TOTAL | $20,007,388 |

b. Summer Jobs

| Year of Hire | Average Earnings for All USS Employees |
|---|---|
| 1972 | $ 15,192 |
| 1973 | 137,072 |
| TOTAL | $ 152,264 |
| OVERALL TOTAL | $20,159,652 |

## V. *Fringe Benefits*

■ 41. In addition to "straight salary" as a component of back pay, the plaintiff class is entitled to an award of fringe benefits. *See, e.g., Rasimas v. Michigan Dept. of Mental Health,* 714 F.2d 614, 626 (6th Cir.1983), *cert. denied,* 466 U.S. 950, 104 S.Ct. 2151, 80 L.Ed.2d 537 (1984); *United States v. Lee Way Motor Freight, Inc.,* 625 F.2d 918, 945 (10th Cir.1979); *Pettway, supra,* 494 F.2d at 263; *Rosen v. Public Service Electric & Gas Co.,* 477 F.2d 90, 96 (3d Cir.1973); *Shaffield v. Northrop Worldwide Aircraft Services, Inc.,* 373 F.Supp. 937, 945 (M.D.Ala.1974). The dual purpose of this award is to make plaintiffs whole and to deter defendant from future wrongdoing.

42. During the relevant time period, USS fringe benefits for laborers were better than those generally available for similar positions in the outside labor market.

43. In the earlier years, the cost of USS fringe benefits exceeded 50% of the hourly USS wages paid (Ex. P-200, at 104-07).

44. USS actively negotiates with the Steelworkers' Union for the salary pack-

age, which includes fringe benefits as a significant amount of each worker's total salary.

45. USS conceded that, as a general principle, the plaintiff class is entitled to some fringe benefits. However, defendant maintains that plaintiffs have not proven any loss and so have not sustained any recognizable damages for fringe benefits. In other words, defendant claims that each member of the plaintiff class must prove an actual loss prior to this Court awarding any fringe benefits.

46. I find that the fringe benefits were of great value to the plaintiff class. Accordingly, the question is how to calculate the allowable fringe benefits, and not whether to grant them at all.

47. A reasonable method for computation of fringe benefits for the class is to use the fringe benefits received by those USS P & M employees who were hired during the liability class years.

48. It is reasonable to conclude that the plaintiffs, had they been hired, would have received at least as much benefit from USS fringe benefits as actual USS employees received.

49. USS acknowledged that it would be impossible to ascertain the dollar value of USS fringe benefits received by each person who actually was hired by USS during each liability period.

50. USS is a self-insurer, and calculates its cost on an actual loss basis. At plaintiffs' request, USS provided the average cost to USS in each liability year for several fringe benefits. Notwithstanding these computations USS maintained that cost was not the proper measure of the value to plaintiffs of the fringe benefits. (Ex. P–200, Section V).

51. I find that the use of USS cost, rather than computation of loss for each member of the plaintiff class, is a reasonable method for calculation of fringe benefits to award plaintiffs under the circumstances of this case, for the reasons set forth below.

52. Plaintiffs are clearly entitled to some amount of some fringe benefits. USS cannot simply claim that the cost method is inaccurate without offering an alternative affirmative method of calculation. In this situation all of the relevant factual damages information resided with defendant, and was most easily usable or computed, by USS employees, if by anyone at all. While I remain aware that plaintiffs bear the burden of demonstrating their damages, when it is clear, as here, that plaintiffs are entitled to a fringe benefit award, I find it incumbent upon defendant to do more than simply say it does not agree with plaintiffs' computation efforts.

53. Second, I find that average cost for a self-insuring company like USS is a reasonable method of computation, and does not excessively overestimate the damages.

54. Last, to the extent that the average cost amounts are excessive, USS as the wrongdoer should bear the loss. *See, e.g., Craig v. Y & Y Snacks, Inc.,* 721 F.2d 77, 83 (3d Cir.1983).

55. USS presented the testimony of George Hensarling, USS Director of Employee Benefits for the past eight years, and an employee of USS for 38 years. Mr. Hensarling negotiates the contract with the Steelworkers' Union, and is responsible for administering all of the USS fringe benefits.

56. Mr. Hensarling testified that following USS's most recent contract negotiations with the union (March 1983), the base wage rate agreed upon for non-incentive jobs was $12/hour, with $11/hour for unworked hours—fringe benefits (such as insurance, pensions, etc.) and vacation, holidays and funeral leave.

57. During the middle of the damages trial a dispute arose as to the interpretation of the stipulated damages figures for fringe benefits.

58. Specifically, defendant argued that the fringe benefit costs in the stipulated damages were overinclusive, while plaintiffs believed these numbers represented the average fringe benefit costs to USS for

the plaintiff class. For the reasons developed below, I find plaintiffs' position prevails.

59. During the damages discovery period plaintiffs asked USS to state the average per capita cost or value, for each year from 1972 through 1985 for each of the pertinent USS fringe benefits provided to USS P & M employees hired during the liability periods. (Exs. P–201, No. 5; P–203; P–204). This request sought the average yearly cost for the class members, had they been hired, beginning with the year of application and continuing through 1985.

60. On the same day as plaintiffs' request, defendant agreed to calculate the following:

For each of the years for which liability has been found (July 11 through the end of 1972, 1973, 1974, 1978 and 1979) USS will identify by year class the total number of persons hired and for such hires the dollars paid as earnings, fringe or benefit payments for all subsequent years through December 1983 [later updated through December 1985]. We will determine the average dollars paid per individual per year class for each year subsequent to hire. This figure will be used as a base point for calculating back pay for each year class, from which will be subtracted the mitigation factor—i.e. average expectable earnings or benefits had the individual *not* worked at USS.

Letter of January 10, 1984 from USS counsel to plaintiffs' counsel.

61. Defense counsel added the caveat that the above calculations would be made to the extent possible using USS's data, and of course, without waiving USS's right to litigate the issue of plaintiffs' entitlement to fringe benefits and the use of cost as a proper measurement of damages.

62. What is clear even from the initial contacts during discovery is that the parties agreed to the accuracy of the calculations, and agreed to use these cost calculations as the measurement of fringe benefits for the plaintiff class, should the Court find plaintiffs were entitled to fringe benefits. Further they agreed that cost to USS

was a reasonable method of measuring the value to plaintiffs in the absence of another reasonable method.

63. Plaintiffs' supplemental discovery request of October 31, 1985 reiterated their request for the cost of average fringe benefits for class members. *See* Ex. P–204, for the definition of fringe benefits:

"Fringe benefits" means all compensation, and benefits other than "earnings," provided to, for or on behalf of P & M hires, including F.I.C.A. contributions made by USS, unemployment compensation, supplemental unemployment benefits, pension, workers compensation and insurance (health, life, dental, S & A, and vision).

64. Using this definition, plaintiffs' request for admission No. 5 stated:

Thomas P. Preston, Esq.'s letter of September 27, 1984, at page 3 (a copy of which is attached and incorporated) correctly states the total dollar cost to USS, per employee, by year, of each of the benefits listed therein, specifically "F.I.C.A.," Unemployment Compensation, Supplemental Unemployment Benefits, Pension Benefits, Workman's Compensation and Insurance (including Health, Life, Dental, S & A, and union).

Defendant admitted Request No. 5.

65. At this point, at worst, plaintiffs' request for admission was inartful and a bit ambiguous, because plaintiffs ask for the "total dollar cost to USS, per employee," without adding that the "employee" referred to is of course, one who would be a P & M hire, the counterpart to the plaintiff class, since those were the figures the parties had agreed to use for purposes of calculating cost.

66. USS gave plaintiffs the "total cost to USS per employee," and thereafter, at successive times, always confirmed the accuracy of the calculations USS provided to plaintiffs up to and including the first day of the damages trial. (*See* Exs. P–200, P–207, P–208).

67. At no time before trial did USS challenge the appropriateness of using the

costs it had supplied, for calculating the cost of fringe benefits lost by the plaintiff class, should this Court determine cost was a reasonable method of fringe benefit calculation. (*See* Exs. P–208, P–209).

68. The annual cost to USS of each pertinent fringe benefit is set forth in the stipulated damages figures. (Ex. P–200, Section V).

69. On the third day of the damages trial, for the first time USS (through Mr. Hensarling's testimony) clearly revealed that its fringe benefit calculations not only included the plaintiff class, but also included any USS employees who are retired or who are on layoff, but who are still covered by USS benefits. Thus, according to USS, the calculations in the stipulated damages figures in Section V were grossly overinclusive.

70. Mr. Hensarling proceeded to testify to adjusted figures, using the stipulated damages as his base (Ex. P–200), to reflect the percentage of overestimate he believed would be a necessary reduction in order to reflect *only* P & M hires in a given year.

71. I reject Mr. Hensarling's percentage reductions for the fringe benefits of insurance, pension, and supplemental unemployment benefits (SUB), for several reasons.

72. As Mr. Hensarling admitted, USS did not disclose the substance of this portion of Mr. Hensarling's testimony in the sworn interrogatory responses it served on plaintiffs' counsel shortly before trial (identifying trial witnesses and providing requested summaries of their expected testimony). *See* Ex. P–209, No. 2(a).

73. Mr. Hensarling was not involved in the case until approximately one week before the damages trial. Up to that point, USS was relying on Section V of the stipulated damages figures as accurate reflections of how to calculate any fringe benefits awarded to plaintiffs, in the event the Court decided that average cost to USS was a reasonable method of calculating fringe benefits.

74. This Court finds it difficult to believe that USS maintained all along that the fringe benefit cost calculations represented cost to USS for employees other than the counterparts to the plaintiff class.

75. USS did *all* of the calculations, without any representative from plaintiffs reviewing the raw data. If, at some point during discovery, USS determined (as Mr. Hensarling later testified) that it is impossible to extract P & M hires from USS total cost for insurance, then it was incumbent upon defendant to notify plaintiffs of this limitation in the data source.

76. It strains credibility to argue, as USS does, that all along, it knew and that it so communicated to plaintiffs, that the insurance calculations were overinclusive. USS knew that plaintiffs were relying upon its accurate portrayal of fringe benefit cost to USS for P & M workers hired during the liability years, as the matching counterparts to the class.

77. During the damages trial USS did not offer the Court any specific numbers to substitute for those in the stipulated damages figures. The first time any revised calculations were provided was as attachment to defendant's post-trial pleadings. These revised tables are *not* in evidence.

78. Nonetheless, even assuming that USS's position is theoretically more accurate (thus putting to the side the misrepresentations to plaintiffs), USS did not present any credible evidence on which to base USS's suggested reductions of the insurance benefit calculations in the stipulated damages.

79. Mr. Hensarling conceded that his percentage reductions were "guesstimates," not based on more than his general sense of the people in the plaintiff class. Based on this speculation, Mr. Hensarling then offered percentage reductions of the insurance calculations, to exclude, *inter alia*, retirees and USS employees on layoff.

80. Mr. Hensarling also freely admitted that there were no "hard numbers" one could use to isolate insurance costs to USS for the plaintiffs' counterparts during the liability years, because the method of insurance claims handling for USS is company-

wide. In other words, all USS's divisional insurance claims are lumped together.

81. Finally, to the extent the stipulated damages figures overestimate the fringe benefits due plaintiffs, the equities militate in favor of allowing these calculations to stand. As stated above, *USS*, not plaintiffs, were in possession of any and all data for the possible fringe benefit calculations. If these calculations would not isolate the plaintiff class, defendant had a duty to so inform plaintiffs.

82. I find that the most reasonable construction of plaintiffs' discovery requests and defendant's responses is that plaintiffs sought fringe benefits costs for the plaintiff class counterparts, and that plaintiffs justifiably and reasonably relied on defendant's responses to provide calculations for that group alone.

### A. *Insurance Benefits*

83. The benefits provided by USS to its P & M employees under the insurance program consist of life insurance, sickness and accident benefits (S & A), hospital coverage, physicians' services, major medical coverage, and dental and vision protection. (Exs. P–215 through P–221). Although USS employs an insurance carrier to process claims, USS is self-insured for its insurance program and thus is responsible for paying each claim. Mr. Hensarling described this as an "actual cost" system.

84. Mr. Hensarling testified that from the employees' standpoint, the USS insurance program is very good. It provides "first dollar coverage;" that is, the employee is not required to pay anything—no deductible and no co-insurance.

85. The level of sickness and accident coverage and the amount of life insurance provided to employees at USS are tied to the employee's wages, which is reviewed on an annual basis.

86. The USS sickness and accident program provides a source of income for employees who, as a result of illness or injury, are unable to work.

87. USS's hospitalization program pays employees or dependents for inpatient or outpatient treatment, including maternity benefits.

88. USS's physicians' services and major medical coverages pay for other medical expenses of employees.

89. The USS vision program pays for eye exams and the cost of glasses.

90. USS's dental benefits pay dental expenses of employees and their dependents.

91. The amounts set forth in the Stipulated Damages Figures are a fair and reasonable measure of the value of USS's insurance benefits to its employees and, in turn, to the plaintiffs. (Ex. P–200 at 39–51).

92. USS tried to limit or eliminate the use of these figures with Mr. Hensarling's testimony that each individual employee has hurdles to overcome (*e.g.*, minimum 520 hrs. of work before covered, review by USS of a claim before it is paid, etc.)

93. I find that any of these concerns do not undermine the validity of using an average annual cost to USS for its employees, because on the whole, the average cost or payout by USS only reflects those people who have overcome those hurdles, and this Court has every reason to believe that the plaintiff class, on the average, would be similar to their counterparts who were hired by USS.

94. Insurance rates in the Stipulated Damages were calculated by multiplying the Black Hiring Shortfall for each year class (adjusted downward annually to account for attrition) by the average yearly insurance per capita (the cost to USS of providing insurance on a year-by-year basis for each relevant employee). This yields a total average yearly insurance amount per cohort.

95. For the reasons articulated as to straight salary portions of back pay, *supra*, I find that the proper reference group for insurance rates (and the other fringe benefits) is all USS employees.

96. Using the applicable charts in the Stipulated Damages (Ex. P–200, Section V) yields insurance benefits for the Black Hiring Shortfall in the following amounts:

a. Permanent Jobs

| Year of Hire | Total Aggregate Insurance |
|---|---|
| 1972 | $ 236,358 |
| 1973 | 1,310,298 |
| 1974 | 1,153,578 |
| 1978 | 1,201,005 |
| 1979 | 613,325 |
| ALL YEARS TOTAL — | $4,514,564 |

b. Summer Jobs

| Year of Hire | Total Aggregate Insurance |
|---|---|
| 1972 | $ 4,406 |
| 1973 | 41,122 |
| ALL YEARS TOTAL — | $ 45,528 |

(For the summer jobs, USS provided percentages of the overall yearly cost which may be fairly attributed to summer jobs.)

B. *Pension Benefits*

■ 97. USS completely funds its pension plan, using actuarial estimates. Under the pension program, a USS employee who has ten years of continuous service receives a vested pension.

98. The type and amount of pension is determined based on such factors, *inter alia*, as age, continuous services at retirement and an employee's earnings history.

99. When an employee is on layoff, he or she continues to accrue pension rights for a period up to two years. In addition, USS employees on layoff have recall rights for five years. Thus an employee who returns to active employment at USS within the five-year period maintains protected pension years accrued to date.

100. When an employee returns to active employment he or she receives another two year period for accrual of pension service. Thus, in order to receive a vested pension benefit, an employee need not actually work all ten years. For example: a member of the plaintiff class, if hired, could have worked for 4 years, then been on layoff for 2 years, worked for 2 years and then been placed on layoff again for 2 years. At the end of this ten year period, that individual would have a vested pension

interest, although he or she worked for only 6 of the 10 years required for vesting.

101. The pension plan is funded on a group basis, not tied to an individual USS employee. Nonetheless, each year USS is obligated to make payments to the pension plan on behalf of every USS employee. The USS actuaries include in their annual calculation a factor for employee attrition.

102. As with the insurance calculations, Mr. Hensarling, at trial, testified to reductions in calculations for the plaintiff class pension benefits in the Stipulated Damages.

103. For reasons articulated above in the insurance section, I decline to adopt these eleventh-hour revisions.

104. In addition to the eleventh-hour nature of the calculations, Mr. Hensarling did not testify to data upon which I could rely.

105. The first time tables reflecting Mr. Hensarling's revisions were presented to the Court was in defendant's post-trial papers. These tables are *not* in evidence.

106. Moreover, this case from its inception has involved the use of complex and controlled statistical evidence. Mr. Hensarling admitted that his methods fell far short of this attempted precision.

107. For example, Mr. Hensarling testified that he "looked at" a recent liability year and found that approximately 38% of the funding went to employees for past service and 62% for current service. Based on this approximation (for which no documentation was supplied or even referred to) Mr. Hensarling decided to adjust the pension figures downward by 30%, to eliminate retirees who were not part of the plaintiff class.

108. Mr. Hensarling also conceded that although a USS employee's pension benefit does not vest until ten years of accumulated service, in the earlier years the amounts contributed by USS are designed to cover collection by USS employees in future years.

109. Mr. Hensarling testified that USS sometimes permits individuals to receive immediate lump sum payments when they

leave USS in lieu of deferred payments under the plan.

110. Many persons USS hired for P & M entry-level jobs during the liability periods now have vested interests in the USS pension.

111. Of the 328 members of the plaintiff class who should have been hired for permanent jobs, at least 70 would still be working at USS, and others on layoff would obtain future vested interests in the pension plan (Ex. P–200 at 4–10).

112. Mr. Braithwaite, USS Director of Corporate Employment (whose responsibilities include, *inter alia*, development of employment policies and procedures) testified that of the 1,486 P & M employees at Fairless Works currently on layoff, only about 100 of those have been laid off longer than two years.

113. Mr. Braithwaite also testified that all of the 1,486 P & M employees now on layoff may be recalled from layoff by 1990.

114. The amounts in the Stipulated Damages Figures are a fair measure of the per capita value to the plaintiffs of USS's pension benefits. (Ex. P–200, Section V at 26–38).

115. As with insurance benefits, the cost of the pension benefit has been calculated by year class with the Black Hiring Shortfall in each subsequent year reduced to reflect attrition. This adjusted shortfall is then multiplied by the average yearly cost per capital, for a total average cost in that year. When totalled, this yields the aggregate average benefit for that year class.

116. Using all USS employees as the reference group for pension benefits yields the following pension benefits for the plaintiff class, using the Stipulated Damages Figures (Ex. P–200 at 26–38).

Permanent Jobs

| Year of Hire | Total Aggregate Pension |
| --- | --- |
| 1972 | $ 160,150 |
| 1973 | 875,392 |
| 1974 | 807,028 |
| 1978 | 871,174 |
| 1979 | 449,889 |
| ALL YEARS TOTAL — | $3,163,633 |

C. *Social Security Benefits*

117. John Re, a USS employee for 30 years, and currently a Manager in Tax Accounting, is responsible for all payroll tax withholding (federal, state and local income taxes, social security taxes, and federal and state unemployment taxes). He testified to the nature of the social security program as it affects USS and its employees.

118. Social Security tax is deducted from each USS employee's pay. The employer pays an equal amount, and together the tax is paid to the U.S. Treasury on a periodic basis.

119. These amounts fund social security benefits. The payments in any given year fund social security benefits for current recipients. Thus specific funds are not designated to the currently employed individuals account, nor even segregated as to USS or another company.

120. In order to receive social security retirement benefits, an employee, at 62 years old, must have to his or her credit forty or more quarters of qualifying employment.

121. An individual's earnings over the course of his or her work history determine the payments to which he or she is entitled under social security. Accordingly, the higher the earnings, the greater the benefits, although the rate of increase is not precisely proportional to the increased earnings.

122. Had the plaintiffs been hired, the quarters they worked for USS would be counted toward their social security coverage. Class members who were not hired by USS and did not find work elsewhere would receive no coverage toward the requisite forty quarters, because they would not be considered sufficiently attached to the labor market.

123. Had plaintiffs been hired, USS would have made social security tax payments on their wages.

124. Social security payments made by USS, while not tied to a particular

employee, nonetheless confer a benefit on a USS employee which the plaintiffs would have received had they been hired.

125. Further, the USS wages—markedly higher than other laborer positions in the Philadelphia area—would have benefitted plaintiffs by increasing their overall earnings.

126. At least two other courts have recognized that social security benefits are cognizable components of back pay recovery in discrimination cases. *See Blim v. Western Electric Co.,* 731 F.2d 1473, 1480 (10th Cir.), *cert. denied, AT&T Technologies, Inc. v. Blim,* 469 U.S. 874, 105 S.Ct. 233, 83 L.Ed.2d 161 (1984) (social security payments by employer included in court's back pay award in age discrimination case); *EEOC v. Pacific Press Publishing Association,* 29 Empl.Prac.Dec. (CCH) ¶ 32,907 at 26,297 (N.D.Cal.1982) (Title VII back pay award included social security tax payments, "on the basis that all monies paid are wages paid ... or untaxed fringe benefits, as the case may be.").

127. Mr. Binkley, Staff Supervisor of Employment and Benefits at the USS Fairless Hills facility, testified that the payment of employer social security contributions for a person who was improperly denied employment would be in keeping with the "make whole" concept.

128. Recognizing the inherent imperfection associated with the estimation of damages, yet keeping in mind the value of the social security payments to plaintiffs, I find that the amounts in the Stipulated Damages Figures are a reasonable and fair measure of the social security benefits to which plaintiffs are entitled.

129. Using all employees as the reference group, the Stipulated Damages Figures yields the following social security benefits for the Black Hiring Shortfall:

a. Permanent Jobs

| Year of Hire | Social Security Benefits |
|---|---|
| 1972 | $ 132,667 |
| 1973 | 734,264 |
| 1974 | 638,680 |
| 1978 | 675,001 |
| 1979 | 344,899 |
| ALL YEARS TOTAL — | $2,525,511 |

b. Summer Jobs

| Year of Hire | Social Security Benefits |
|---|---|
| 1972 | $ 790 |
| 1978 | 8,019 |
| ALL YEARS TOTAL — | $ 8,809 |

### D. *Workmen's Compensation Benefits*

130. The purpose of the Pennsylvania Workmen's Compensation Act is to compensate for wages lost by employees who are injured during the course of their employment. As a wage replacement, it has value to plaintiffs.

131. USS is self-insured as to workmen's compensation, making payments to employees based on actual injuries.

132. Mr. Billy Helm, a USS employee who is Manager of the Workmen's Compensation and Casualty, and who has 20 years experience in workmen's compensation matters for USS, testified that USS annually places in reserve a specific dollar amount for estimated future liability. The cost to USS per employee is maintained on an annual basis in order to predict the future cost to USS.

133. The Pennsylvania Workmen's Compensation Act protects P & M laborer employees at Fairless Works from their first day of employment.

134. Mr. Helm testified that because of USS's high hourly wage rates, employees at USS who are injured in the course of employment are entitled to the statutory maximum amount of compensation set by the Commonwealth of Pennsylvania.

135. Workmen's Compensation payments continue for as long as the disability continues.

136. Some employees hired by USS in each of the liability periods have received Workmen's Compensation payments. (Ex. P–209, No. 5(d)). Had plaintiffs been hired by USS, some of them would have received Workmen's Compensation payments. (Ex. P–209, Nos. 2 and 5).

137. The amounts in the Stipulated Damages Figures reflect, on an annual basis, the average per capita cost to USS for workmen's compensation.

138. Because the cost to USS is the best available source of the value to the plaintiffs of the fringe benefits, I find that the workmen's compensation cost calculations in the Stipulated Damages Figures are a fair statement of the annual per capita value to plaintiffs of the workmen's compensation payments.

139. USS did not offer any alternative method for computing workmen's compensation benefits, which can be viewed either as a fringe benefit or a wage replacement (since Pennsylvania is a wage-loss state). In either case, this benefit is clearly part of this Court's back pay calculation.

140. Using the tables from Stipulated Damages Figures with all USS employees as the reference group yields the following workmen's compensation benefits for plaintiffs:

a. Permanent Jobs

| Year of Hire | Average Workmen's Compensation Benefits |
|---|---|
| 1972 | $ 43,116 |
| 1973 | 238,224 |
| 1974 | 210,013 |
| 1978 | 271,765 |
| 1979 | 143,554 |
| ALL YEARS TOTAL — | $906,672 |

b. Summer Jobs

| Year of Hire | Average Workmen's Compensation Benefits |
|---|---|
| 1972 | $ 608 |
| 1973 | 2,741 |
| ALL YEARS TOTAL — | $ 3,349 |

E. *Unemployment Compensation Benefits*

141. The Pennsylvania Unemployment Compensation law established an employer-financed program to replace wages lost by claimants who become unemployed through no fault of their own.

142. USS makes periodic unemployment compensation payments to the Commonwealth for its P & M employees at Fairless. Those payments go into a general fund established by the Commonwealth for payment of unemployment compensation claims.

143. The amount of compensation to which an employee is entitled is determined by the wages that he or she received while working. Because the hourly wage rate at USS is so high, its employees are entitled to the maximum rate of compensation.

144. USS argues that its contribution (cost) to the unemployment compensation fund should not be awarded to plaintiffs as part of their back pay recovery because these employer contributions are not direct payments to employees, and because the Third Circuit has held that any unemployment compensation benefits received by a Title VII plaintiff should not be deducted from a Title VII back pay award, as part of mitigation or "interim earnings" or "amounts earnable with reasonable diligence," 42 U.S.C. § 2000e–5(g). *Craig v. Y & Y Snacks, Inc.*, 721 F.2d 77, 83 (3d Cir.1983).

145. The *Craig* Court based this decision on the following characterization:

> Unemployment compensation most clearly resembles a collateral benefit which is ordinarily not deducted from a plaintiff's recovery. 721 F.2d at 83.

146. However, simply because receipt of unemployment compensation is not deductible does not mean that unemployment compensation is not a benefit which plaintiffs are entitled to receive as a component of their total back pay award.

147. This is distinguishable from *Craig*, because here I am not concerned with deducting receipt of unemployment compensation benefits received, but rather, with predicting or estimating the increased value of unemployment compensation benefits as USS employees, over and above any unemployment compensation benefits plaintiffs received while employees of another company.

148. Thus, although unemployment compensation benefits most closely resemble collateral benefits, in order to make plaintiffs whole, plaintiffs are entitled to the difference between the unemployment compensation benefits they would have received at USS and those they did receive, if any, while employed outside USS.

149. The best way to measure this fringe benefit to plaintiffs is to use the cost

to USS, with a percentage deduction for fringe benefits, as agreed upon by the parties.

150. Admittedly an imperfect measurement, it is the best available method of calculating the value of unemployment compensation benefits to the average plaintiff.

151. Further, use of the cost figures serves the dual purpose of making plaintiffs whole and penalizing the wrongdoer. *Craig, supra,* 721 F.2d at 83 and n. 2 (back pay " 'serves to work complete equity by *penalizing the wrongdoer economically* at the same time that it tends to make whole the one who was wronged' ") (emphasis supplied in *Craig,* quoting *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 787, 96 S.Ct. 1251, 1275, 47 L.Ed.2d 444 (Powell, J., concurring and dissenting)).

152. I find that plaintiffs are entitled to an award for unemployment compensation benefits, as measured by USS's contribution to the unemployment compensation fund.

153. During any 52-week period of unemployment, an employee is entitled to an amount equal to 26 weeks of weekly unemployment compensation benefits, spread over the 52-week period.

154. A number of P & M employees hired by USS in the liability years were on layoff for at least some time since being hired. (Ex. P–209, No. 6). Had USS hired class members in the liability periods, they also would have experienced layoffs and would have received unemployment compensation benefits.

155. The amounts in the Stipulated Damages Figures are a fair representation of the per capita value to the plaintiffs of USS's unemployment compensation payments. (Ex. P–200 at 78–90).

156. Using the tables from the Stipulated Damages Figures, with all USS employees as the reference group, yields unemployment compensation benefits for plaintiffs in the following amounts:

a. Permanent Jobs

| Year of Hire | Unemployment Compensation Benefits |
|---|---|
| 1972 | $ 42,032 |
| 1973 | 236,626 |
| 1974 | 201,473 |
| 1978 | 219,292 |
| 1979 | 108,305 |
| ALL YEARS TOTAL | — $807,728 |

b. Summer Jobs

| Year of Hire | Unemployment Compensation Benefits |
|---|---|
| 1972 | $ 608 |
| 1973 | 9,595 |
| ALL YEARS TOTAL | — $ 10,203 |

### F. *Supplemental Unemployment Benefits (SUB)*

157. SUB is a contractually required payment that USS makes to its employees on layoff to supplement what they receive from the Commonwealth in unemployment compensation.

158. USS employees hired in the liability periods are entitled to receive SUB from USS for up to 52 weeks, after a two-year waiting period.

159. Mr. Hensarling acknowledge that SUB represents a valuable fringe benefit to a USS employee.

160. Had plaintiffs been hired, some of them would have received SUB benefits.

161. The amounts in the Stipulated Damages Figures are a fair representation of the per capita value to the plaintiffs of USS's SUB payments. (Ex. P–200 at 91–103).

162. USS contended, through the testimony of Mr. Hensarling, that the SUB amounts for the first two years for every cohort should be subtracted from the stipulated damages calculations to reflect a threshold requirement—namely that USS employees must have completed two years of continuous service before they are eligible for SUB.

163. I reject this adjustment. Mr. Hensarling admitted on cross-examination that his adjustment was overinclusive. His adjustment deleted not only the costs to USS for two years of new hires, but also costs for those USS employees eligible for SUB benefits.

164. Faced with a choice of under or over inclusiveness of damages, once again I

find that defendant, as the wrongdoer, must suffer the loss, particularly because USS was in the best position to provide the most accurate data possible to reflect its cost of providing these fringe benefits to the plaintiff class.

165. Using the tables from the Stipulated Damages Figures, with all USS employees as the reference group, yields SUB benefits for the plaintiffs in the following amounts:

a. Permanent Jobs

| Year of Hire | SUB Benefits |
|---|---|
| 1972 | $ 45,134 |
| 1973 | 257,578 |
| 1974 | 214,296 |
| 1978 | 211,296 |
| 1979 | 96,642 |
| ALL YEARS TOTAL — | $824,946 |

b. Summer Jobs

| Year of Hire | SUB Benefits |
|---|---|
| 1972 | $ 1,063 |
| 1973 | 9,595 |
| ALL YEARS TOTAL — | $ 10,658 |

## VI. *Mitigation of Wages and Fringe Benefits*

### A. *Mitigation Concept*

166. The parties recognized that in determining damages under section 706(g) of Title VII, the amounts of lost USS wages and fringe benefits which 386 plaintiff class members could have earned at USS must be mitigated by amounts those persons subsequently earned, or with reasonable diligence could have earned, working at other jobs.

167. Defendant bears the burden of demonstrating the plaintiff class members' interim earnings, or amounts earnable with reasonable diligence. 42 U.S.C. § 2000–5(g).

168. All uncertainties or doubts should be resolved in favor of the plaintiffs, because of Title VII's dual goal: to make plaintiffs whole *and* to discourage employees from engaging in discriminatory acts.

169. Because it is impossible to ascertain which class members would have been hired by USS to fill the 386 jobs in question (of the approximately 13,000 class members), the efforts those 386 persons made to find employment elsewhere are unknown. Thus, the parties agreed to value the plaintiffs' mitigation efforts by developing profiles of the class members and use published data gathered by the government to compute the earnings of similar blacks living in the eight county region known as the Philadelphia Standard Metropolitan Survey Area (SMSA). The outside wages obtained from the census data are then to be subtracted from USS lost wages to yield the plaintiffs' net lost wages.

170. Both parties presented the testimony of highly qualified experts, who conducted mitigation studies for the class by developing profiles of the class members, projecting outside earnings, and then computing net damages.

171. The court finds that it is appropriate to address mitigation by estimating outside wages on a class-wide basis as follows:

(a) by developing a profile of the class members in each liability period, based upon their age, sex, and educational traits because these traits, in combination, are considered statistically significant as earnings predictors; and

(b) by using those age, sex, and educational profiles to obtain estimates of black earnings from local labor force census information; and

(c) by basing such estimates upon earnings of blacks in the SMSA; and

(d) by accounting in some reasonable manner for persons who made no attempt to find work comparable to that offered by USS; and

(e) by accounting in some reasonable manner for inflation and real wage growth of the class members (including aging of the plaintiff class).

172. To mitigate fringe benefits, the parties stipulated to a formula for estimating the fringe benefits that the Black Hiring Shortfall would have received in the outside labor market. The ratio of outside wages to USS wages is applied to USS's cost of fringe benefits, yielding outside fringe benefits. The outside fringe bene-

fits amount is then subtracted from USS's cost of fringe benefits, yielding mitigated fringe benefits. (Ex. P–200, Section V).

## B. *The Killingsworth Studies*

173. Plaintiffs' expert, Dr. Mark Killingsworth, a labor economist, performed a series of analyses which satisfied the mitigation framework described above. He submitted an expert report detailing his studies (Ex. P–234), and he testified at trial.

### (1) *Determination of USS Lost Wages*

174. Using the Stipulated Damages Figures, Dr. Killingsworth selected the average annual wages of white employees who were hired by USS during the liability periods as the appropriate measure of the wages that the class members would have received from USS had they been hired. His report also contained similar calculations using the earnings of all USS employees.

175. As the Court previously found, use of "all" USS employees is the proper reference group for determination of what plaintiffs would have earned at USS, had they been hired.

176. For those plaintiffs who should have been hired in each liability period, Dr. Killingsworth made annual adjustments to the USS wages to account for attrition.

### (2) *Developing Class Member Profiles*

177. Dr. Killingsworth prepared class member profiles for each liability period. In doing so, he assumed that class members in any year possessed the characteristics and traits of those blacks that USS actually hired during that liability period. He also assumed that the traits that would be significant in determining outside earnings for the class would be age, sex and educational level. He did not assume that the traits of class members in one liability period would be the same as traits of class members in other liability periods.

178. In developing each of his five class member profiles, Dr. Killingsworth used information gathered by Dr. Litwin, an expert statistician who testified for plaintiffs

at both the liability and damages portions of the trial.

179. Dr. Litwin made a random sample of employment applications submitted by blacks who were hired for P & M labor jobs at Fairless Works during each liability period. Dr. Litwin sampled the applications of approximately 530 black individuals who were hired by USS.

180. Dr. Litwin converted the following information obtained from the sample applications into machine-readable form: the sex/race code, the date of application, the date of hire, the year of birth, the number of years of education and the type of work requested.

181. From this computer-coded information, Dr. Litwin created cells, according to age, education, date of application, and year of hire.

182. Using Dr. Litwin's data base, Dr. Killingsworth developed five separate profiles of the blacks who were actually hired by USS in the years 1972, 1973, 1974, 1978 and 1979.

183. Dr. Killingsworth decided to use the profiles of the USS hires (rather than ones based upon unsuccessful applicants) for three main reasons: (1) he had information about the blacks USS hired in each of the liability years and thus was not required to speculate about their age, sex, and education characteristics; (2) those black class members who should have been hired by USS in each liability period would likely have resembled those blacks who were actually hired by USS in that year; and (3) there was no reliable information about the age, sex and education traits of unsuccessful black applicants in years prior to 1975.

184. I find Dr. Killingsworth's articulated reasons for using USS hires to draw samples for his profiles (rather than using data drawn from the unsuccessful applicant pool) a persuasive method for preparing profiles. Accuracy in the profiles is particularly important since the "cell" groupings, *i.e.* the categories of sex age and education profiles, form the basis, or

building block, for all of the calculations in Dr. Killingsworth's study, as they did for defendant's expert's study.

185. Dr. Killingsworth's use of and reliance upon profiles of blacks who were hired by USS in each liability year provides a sound basis for his conclusions about outside earnings of class members.

186. It is appropriate to use blacks as the reference group for computation of outside earnings (rather than whites or "all") because, as both parties agreed, black earnings in the general labor market remain traditionally lower on the average.

187. I recognize that using blacks as the reference group for interim earnings does not mirror the inside reference group ("all") but nonetheless find both choices proper. Inside USS the goal is to abrogate or at least to ameliorate any of the racial discrimination found in this Court's liability opinion.

188. By contrast, for interim earnings the Court is not trying to correct the injustice, but rather to measure earnings of plaintiffs or amounts plaintiffs with similar age, education and sex could reasonably be expected to earn in the outside labor market.

189. Both experts agreed that on average blacks earn less and face higher unemployment than whites.

190. As Emerson once said: "A foolish consistency is the hobgoblin of little minds." *ii Self Reliance*, Ralph Waldo Emerson.

### (3) Choice of Census Survey Data

191. Dr. Killingsworth selected published information from the U.S. Censuses for 1970 and 1980 as his data source for estimating the outside yearly earnings of black class members in each year class.

192. The Census data is based upon a random sample of earnings and employment information about blacks in the Philadelphia SMSA.

193. There are approximately 500,000 blacks 16 years of age or older who are in the labor force in the Philadelphia SMSA.

194. The Census data is based upon a large sample. For example, the 1980 Census includes earnings information on approximately 19,000 black persons in the Philadelphia SMSA labor market. The data in the 1970 Census is based on information collected from approximately 5,000 such blacks.

195. The 1970 Census Data is based on earnings from 1969, and the 1980 census is based on 1979 earnings.

196. A large sample is preferable when the purpose of the study is to collect information about small subgroups, such as the various age, sex, and educational cells contained in each year's profile.

197. Dr. Killingsworth testified that any measurement errors or reporting errors that might be present in individual entries in Census data would tend to cancel themselves out when the data is used to project average numbers, as was done in his studies. I credit his testimony on this issue.

198. Dr. Killingsworth was more confident using the Census data than data from the Current Population Survey (CPS), because the CPS data is not randomly collected, it is derived from a very small sample, and it is less suited for the local studies required in this case. Dr. Killingsworth testified that, other things being equal, statisticians and labor economists have greater confidence in a survey based upon a large sampling population.

### (4) Labor Force Adjustment: Accounting for Persons who Did Not Attempt to Find Work

199. Dr. Killingsworth's studies were designed to exclude persons who made no reasonable attempt to obtain other work. Conversely, he attempted to include those persons who worked or were not, for legitimate reasons, in the labor force.

200. Dr. Killingsworth submitted figures based on two methods of excluding people who did not attempt to find other work.

201. Under his first method—referred to as the "broader method" because it in-

cludes a larger group of persons—Dr. Killingsworth included the earnings of individuals: (1) who had been working or looking for work the week the Census was taken, or (2) who had worked in the two years prior to the Census.

202. Dr. Killingsworth testified that he took this approach because he did not want to exclude people simply because they were not in the labor force on a given date. Instead he looked over a span of time in order to ascertain who was at least making reasonable efforts to find comparable work (either by getting a job (in the last 3 years) or actively seeking a job during the past year.)

203. Dr. Killingsworth also calculated mitigation earnings using a second approach, termed the "narrower definition." In order to be included in Dr. Killingsworth's narrow labor force definition, a person must have worked during the year preceeding the census—*i.e.* 1969 for the 1970 census and 1979 for the 1980 census.

204. In this narrower definition the status of a person's work history the week of the census and two years prior to the Census were not relevant.

205. Using his narrower definition of the labor force, Dr. Killingsworth's outside wages (mitigation earnings) increased somewhat, because fewer people with low or no earnings were included. This in turn lowers net damages against USS for back pay and fringe benefits.

(5) *Computation of Outside Wages*

206. After developing his five profiles and categorizing the age, sex and education characteristics of the hires into cells, Dr. Killingsworth assigned each cell a weight based upon the percentage of profile members in that cell. Applying that weighted average to the Census earnings of each cell group, Dr. Killingsworth was able to calculate the average annual outside earnings for each profile.

207. Since they were never actually hired by USS, Dr. Killingsworth had to estimate when the class members in any year class would have begun work outside.

Dr. Killingsworth assumed that the individuals would have been hired at evenly spaced intervals over the course of the year in question. Given that assumption, the average person was deemed to have begun work at mid-year. For the 1972 year, however, Dr. Killingsworth assumed that those hires began work on October 1 because that year class covered only the second six months.

208. Dr. Killingsworth properly assumed that the outside earnings of the class members would increase over time. He increased the wages each year by using a formula that considered changes in the earnings levels of the entire work force. This projection takes into account age and other factors affecting growth in wages, such as changes in the industry and characteristics of the overall work force. Dr. Killingsworth accounted for the increased earnings of each cell over time by increasing the Census earnings by the actual rate of growth in gross weekly earnings in the private non-farm economy. Dr. Killingsworth called this calculation a growth rate adjustment.

209. Defendant attempted to attack the reliability of this growth rate adjustment on two grounds: (1) the adjustment is not age-specific for each cell, *i.e.* Dr. Killingsworth's projection did not match each cell with earnings corresponding to that age group each year (because the Census data comes out only once every ten years); and (2) the projection method is not reliable because it lumps together all age groups (using an accross-the-board percentage), which is not appropriate because the rate of wage increase is markedly higher for younger workers. This means that by using one percentage, the growth rate is artificially depressed for the majority of the class members (because the class falls on the younger end of the labor force spectrum).

210. Neither attack persuades me to discredit Dr. Killingsworth's growth rate adjustment. Although this projection method is admittedly not cell-specific, it is

considered a standard statistical technique, as conceded by defendant's expert.

211. Moreover, when Dr. Killingsworth used the 1970 Census earnings data (based on 1969 earnings) he used the age of a cell for that year class, without reducing the age of the cell under consideration.

212. For example, to calculate the 1973 outside earnings for a cell of 18–19 year olds in the 1973 year class, Dr. Killingsworth used the 1969 earnings for 18–19 year olds and then projected forward. Yet in 1969 these 18–19 year olds would have been 14–15 year olds. Had Dr. Killingsworth reduced the age for the cells to reflect actual age for the 1969 earnings data, the bases for outside earnings would have decreased, since average wages for 14–15 year olds are significantly less than those for 18–19 year olds.

213. I find Dr. Killingsworth's growth rate adjustment a reliable and valid method of accounting for the increase in outside wages to the class over the years.

#### (6) *"Credit Issue"*

214. If in any year the average wages of USS employees were less than the average outside earnings for class members, Dr. Killingsworth concluded that there were no damages suffered by the class members in that cohort for that year. (Ex. P–234, Exhibit B at 1).

215. Defendant challenged this "cancellation" of damages for a cohort in a given year, arguing that the "excess wages" earned on the outside should be subtracted from the total net damages for that cohort (*e.g.,* the 1973 year class).

216. Plaintiffs' view on this credit issue prevails under the current case law. *See Connecticut v. Teal,* 457 U.S. 440, 455, 102 S.Ct. 2525, 2534, 73 L.Ed.2d 130 (1982) ("It is clear that Congress never intended to give an employer license to discriminate against some employees on the basis of race or sex merely because he favorably treats other members of the employees' group"); *cf. Furnco Construction Corp. v. Waters,* 438 U.S. 567, 579 [98 S.Ct. 2943, 2951, 57 L.Ed.2d 957] (1978) ("It is clear

beyond cavil that the obligation imposed by Title VII is to provide an equal opportunity for *each* applicant regardless of race, without regard to whether members of the applicant's race are already proportionately represented in the work force.") (emphasis in original); *Howard v. Roadway Express, Inc.,* 726 F.2d 1529, 1535–36 (11th Cir.1984) ("averaging out" of discriminatory acts is not acceptable, and court therefore rejected defendant's "bottom line" defense).

217. Similarly here, although the type of discrimination involved requires damages calculation on a class-wide basis, it should be kept in mind that the class members are individuals, and therefore they should not be treated as fungible.

218. I therefore find that Dr. Killingsworth's "cancellation" is the appropriate treatment of those years where outside earnings exceeded earnings at USS.

219. After all of these adjustments, Dr. Killingsworth computed annual outside wages for each of the five year classes.

220. In sum, the outside wages obtained through Dr. Killingsworth's analysis through 1985, using his narrower labor force adjustment and referring to all USS employees, were as follows:

| | |
|---|---|
| Class of 1972 | $ 884,787 |
| Class of 1973 | $ 4,102,274 |
| Class of 1974 | $ 3,553,784 |
| Class of 1978 | $ 2,679,322 |
| Class of 1979 | $ 1,113,855 |
| | $12,352,022 |

(Ex. P–238)

221. Dr. Killingsworth also performed an outside wages study using the "minimum wage methodology." (Ex. P–234 at 17). This calculation assumes that the 386 class members who did not get a job at USS would have immediately found work elsewhere at the then prevailing minimum wage and would have worked 40 hours a week for 52 weeks a year. The same assumption is made for each year through the end of 1985. Under this methodology, Dr. Killingsworth found that the aggregate outside wages of the plaintiffs were

$9,999,000, an amount lower than those obtained in his other methods.

222. This study was done as a "rough check" against his own studies to see whether this method might be a reasonable estimate of the plaintiff class' interim earnings.

223. The Court credits the testimony and report of Dr. Killingsworth and concludes that his analysis provides a fair and reasonable measure of the outside wages of the Black Hiring Shortfall people.

## C. *The Siskin Studies*

224. Defendant presented the testimony of its expert, Dr. Bernard Siskin, who is qualified in the fields of statistics and econometrics. Dr. Siskin's studies followed the same basic format as Dr. Killingsworth, but the Court finds Dr. Siskin's studies less reliable, based on the use of skewed profiles, a less reliable outside source, and less reliable adjustments to account for aging and those members of the class who did not actively seek comparable work.

### (1) *Choice of Reference Group for USS Wages*

225. In the body of his report Dr. Siskin presented mitigation figures using—for inside earnings—the earnings and attrition rates of "all" USS employees. (Ex. D–II–2). As an alternative (but not advocated) Dr. Siskin presented his net earnings with reference to white employees at USS.

226. As discussed *supra,* this Court has found that "all" USS employees are the proper reference group for the measurement of inside earnings.

### (2) *Developing Class Member Profiles*

227. Dr. Siskin, like Dr. Killingsworth, sought to prepare profiles for each liability period, also using cell groupings by sex, age and education. However, Dr. Siskin did not prepare any profiles of blacks who were hired by USS in 1972, 1974, 1978 or 1979. Nor did he prepare a profile of unsuccessful black applicants in any of the five liability periods. Instead, Dr. Siskin based his study on a profile of hires for a single year (1973), "borrowed" that profile for 1972 and 1974, and then calculated a combined profile of hires and applicants for two years (1978 and 1979). (Ex. D–II–2 at 8–9).

228. Dr. Siskin combined the profile of hires and applicants in the latter years in order to create a larger sample. He testified that this was done because a larger sample "always gives you more precision."

229. Even though there were over 250 blacks hired by USS in 1972 and 1974, Dr. Siskin elected not to gather any information about those people. Instead, he simply assumed that the traits of the blacks hired in 1973 were identical to the traits of blacks hired in 1972 and 1974. Dr. Siskin performed no studies to determine whether his profile of the 1973 hires matched the actual characteristics of the 1972 and 1974 hires.

230. In constructing his 1978 and 1979 profiles, Dr. Siskin excluded all of the applications submitted by class members in the preceeding year which would have been considered by USS when hiring in the 1978 and 1979 years. For example, in constructing his 1978 profile, Dr. Siskin disregarded class member applications filed in 1977, even though a class member who applied in 1977 would have been eligible for consideration for employment at USS in 1978. This is so because job applications submitted to USS remained active for anywhere from six months to one year (570 F.Supp. at 259).

231. As a result of ignoring certain class member applications, Dr. Siskin conceded that he had used an "improper sampling frame" and that his study had a bias. Moreover, Dr. Siskin stated that his profiles were based on samples taken by Dr. Finis Welch, who did not testify at the damages trial. Dr. Welch's samples were apparently obtained in connection with the liability proceedings. This Court has previously rejected certain of Dr. Welch's studies drawn from the same data. (570 F.Supp. at 266–271, Nos. 95, 102–03, 112–24). The only effort made by Dr. Siskin to test the accuracy of Dr. Welch's sample was to place a telephone call to an employ-

ee in Dr. Welch's office, and ask for verbal confirmation of the accuracy of Dr. Welch's data.

232. Dr. Siskin's cell groupings differed slightly from Dr. Killingsworth's but this difference was not identified as significant by either expert.

### (3) Choice of Current Population Survey

233. Dr. Siskin relied upon the Current Population Survey (CPS) as his source of data for estimating outside earnings of those blacks in the Philadelphia SMSA who have traits like those in his three profiles. (Ex. D–II–2 at 6–7).

234. The CPS surveys certain families each year and, when published, provides information on earnings of those families for the previous year.

235. The CPS gathers information annually on only about 400 black persons out of the approximately 500,000 blacks in the Philadelphia SMSA labor force.

236. Dr. Siskin testified that the CPS is not a random sample.

237. Dr. Siskin conceded that for the liability years the CPS data includes only approximately 200 blacks 16 years of age or older in the Philadelphia SMSA labor force.

238. Dr. Siskin testified that if he had a choice between two different samples properly selected, he would prefer the larger sample because it would yield more reliable results.

239. Dr. Siskin nonetheless elected to use the CPS because it provides annual information, whereas the Census data, collected only once every ten years, requires projections for years other than 1969 and 1979.

240. Dr. Siskin conceded that if both a Census and a CPS survey were available in a given year he would choose the Census because of its far larger sample size. Dr. Siskin agreed that:

The most widely known and used of the Bureau's [Bureau of Census] public use microdata files are the public use sam-

ples of basic records from the 1960 and 1970 censuses. These files provide the greatest range of demographic, socio-economic and housing variables; the entire country is covered and no segment of the population is left out. The large size of these files makes use even for relatively small areas (States, large SMSA's) possible.

241. Dr. Siskin admitted that, because of the small numbers, the CPS samples are designed for national, not local, studies. More specifically, Dr. Siskin agreed with the following comments on the CPS found in a publication by the Data User Services Division of the Bureau of Census:

[T]he small sample size (relative to the census) of one in 1400 (approximately 50,000 households) severely restricts the potential for subnational analysis.

and

As indicated earlier, the usefulness of the Annual Demographic File [CPS] for subnational data such as for States or SMSA's is severely limited by the one in 1400 sample size.

242. Dr. Siskin also agreed with the following language distributed with the CPS by the Bureau of Census:

It should be kept in mind that the sample design and methods of weighting CPS data are geared toward producing estimates for the entire nation. [In producing] estimates for States the user should be aware that the primary sampling units (PSU's) are drawn from strata which may or may not cross State lines. Consequently, the data would not be as reliable as national data, and the file may lose some of its utility in certain application[s].

243. In conducting its survey, the CPS asks questions of one person from each household. This person is not necessarily the head of household.

244. Dr. Siskin agreed that in collecting its data from various households, the CPS will question whoever answers the door so long as that individual is of a certain age. The CPS obtains its data from that individ-

ual even if that person is not the individual about whom the information is sought.

245. By contrast, the Census distributes written questionnaires to be filled out by the head of household. Both experts agreed that this method of data collection yields more reliable results, especially concerning questions on wages, which another individual in the household may not know as precisely as the wage earner.

246. Dr. Siskin agreed with the following statement about the CPS contained in a document entitled Concepts and Methods Used in Labor Force Statistics Derived from the Current Population Survey, published by the Bureau of Labor Statistics:

> Similarly the data are limited [by] the [adequacy] of the information [possessed] by the respondent and the willingness to report accurately. Usually a single respondent, generally the wife, reports for the entire family. The respondent may not know all of the facts about family members or may be unable to report adequately on their attitudes or intentions. For example, the wife will probably know that her husband is working, but she may not always know exactly how many hours he worked or the precise nature of his job.

247. The CPS data is likely to be unreliable because of the small number of individuals in the sample. For example, 12.5% of the people in Dr. Siskin's 1973 class profile fell into the following four cells: (a) males age 20 to 24, high school education; (b) males age 25 to 34, high school education; (c) males age 20 to 24, non-high school graduates; and (d) males age 25 to 34, non-high school graduates. (Ex. D–II–2, at 16). All of Dr. Siskin's information on that profile was drawn from the CPS which, for that year, collected information on a total of only 24 individuals in those categories. By contrast, for those same four categories the 1980 Census provided data on a total of 2,932 persons.

### (4) Dr. Siskin's Labor Force Adjustments

248. Dr. Siskin's analysis treated all time out of the labor force (as derived from CPS data) as proof of a failure to mitigate. Dr. Siskin also assumed that during that time out of the labor force, the person could have earned wages at the high USS rates. (Ex. D–II–2 at 6–8).

249. Dr. Siskin conceded that one can expect relatively large errors in the CPS information about people who have spent some time out of the labor force. He agreed that classification errors in labor force surveys may be particularly significant in the case of persons with marginal attachments to the labor force.

250. Moreover, in many years the CPS reports in clusters the periods of time in which individuals were out of the labor force. For example, the 1973 CPS has clusters for 1–13 weeks; 14–26 weeks, etc. Dr. Siskin relied upon the clustered data when making his labor force adjustments, using the midpoint week as the cutoff. He assumed that each person in a cluster had been out of the labor force for half of the time period covered by the cluster.

251. Thus, if an individual were reported by the CPS as being out of the labor force in the 14 to 26 week cluster, Dr. Siskin assumed that he had been out of the labor force for 20 weeks. Because he reduces damages for each week out of the labor force by USS earnings, this broad brush approach can significantly reduce the plaintiffs' damages.

252. Dr. Siskin incorrectly assumed that if an individual were out of the labor force for any reason, then USS would have no liability at all during the time that individual was not in the labor force.

253. Dr. Siskin made no corresponding adjustment to the wages paid by USS for time its employees were out of the labor force, nor did his study take into consideration the generous benefits available to USS employees during periods of layoff.

254. Although Dr. Siskin described his mitigation procedure as "precisely the same method that would be applied in an individual damage case," (Ex. D–II–2 at 8), he testified that his formula for calculating outside wages did not work for several

hypothetical individual situations presented on cross-examination.

### (5) *Aging Adjustment*

255. Dr. Siskin aged each of his three profiles for the class year, looking at the average age each succeeding year. He based this aging adjustment on the average age of a profile in a given class year at its inception.

256. Dr. Siskin conceded that he did not make any effort to ascertain the impact attrition would have on the average age of the class members. That is, Dr. Siskin's assumptions on aging the class did not take into consideration the possibility that the average class age could decrease from one year to the next.

257. Dr. Siskin admitted that if his profiles were incorrect, the results of his aging adjustment would not be right. Thus, if Dr. Siskin's use of the 1973 profile for 1972 and 1974 were incorrect, this could have the effect of inflating the value of Dr. Siskin's age adjustment.

258. Dr. Siskin agreed that if the actual class members had age traits different from those his profiles assumed, his aging adjustment would be adversely affected.

259. As I previously found, Dr. Siskin's profiles were flawed because of the lack of reliability of his data base source, and because of his non-random choices for profiles. Thus I also find Dr. Siskin's aging adjustment less reliable than Dr. Killingsworth's forecasting (real wage growth adjustment).

260. I also find Dr. Siskin's aging adjustment unreliable because he based the adjustment on the CPS—a data base choice inferior to the Census Data for this situation.

### (6) *"Credit Issue"*

261. When, for any cohort outside wages in a year exceeded USS wages for that year, Dr. Siskin did not conclude that there were no damages suffered that year. Rather, Dr. Siskin penalized class members by crediting the "excess" outside wages in that year against USS damages due those plaintiffs in other years. He acknowledged that this "counterclaim" method decreased USS's liability by approximately $1.4 million.

262. I previously found Dr. Siskin's crediting of "excess" outside wages is not proper under the case law, and I reject his "bottom line" approach to Title VII damages.

263. Dr. Siskin used the actual starting dates rather than estimating USS start dates in a given year at the half-way point. While in theory Dr. Siskin's approach seems more accurate than Dr. Killingsworth's estimate of starting dates, Dr. Siskin conceded that the statistical effect of this choice is minimal.

264. In combination, considering the minimal overall effect of Dr. Killingsworth's estimate and the flawed nature of Dr. Siskin's profiles, I find start-date estimates sufficiently reliable.

265. Dr. Siskin's use of three biased or borrowed profiles to measure outside wages for five different year classes, his reliance on the meager CPS data, and his questionable age and labor force adjustments seriously flaw his analysis. I find Dr. Killingsworth's studies more reliable.

### D. *Damages Calculations and Recapitulation*

266. The most appropriate method of calculation uses Dr. Killingsworth's studies, with "all" attrition rates and his "adjusted" or "narrow" definition of the labor force. (Ex. P–238).

267. The calculations breakdown is as follows (unless noted, numbers are derived from Ex. P–238):

| | | |
|---|---|---:|
| a. | Lost USS Wages for Permanent Jobs (Finding No. 40(a)) | $20,007,388 |
| | Less: Outside Earnings | 12,352,022 |
| | Net Lost Wages for Permanent Jobs | $ 7,655,366 |
| b. | Lost USS Wages for Summer Jobs (Finding No. 40(b)) | $ 152,264 |
| | Less: Outside Earnings | 85,875 |
| | Net Lost Wages for Summer Jobs | $ 66,389 |

| | | |
|---|---|---|
| c. | Lost USS Fringe Benefits for Permanent Jobs (Finding Nos. 96(a), 116, 129(a), 140(a), 156(a) and 165(a)) | $12,743,054 |
| | Less: Outside Fringe Benefits | 8,101,142 |
| | Net Fringe Benefits for Permanent Jobs | $ 4,641,912 |
| d. | Lost USS Fringe Benefits for Summer Jobs (Finding Nos. 96(b), 129(b), 140(b), 156(b) and 165(b)) | $ 78,547 |
| | Less: Outside Fringe Benefits | 44,286 |
| | Net Fringe Benefits for Summer Jobs | $ 34,261 |

268. Thus plaintiffs' total damages for back pay and fringe benefits, after mitigation, are $12,397,928. (Exs. P–234, P–238).[3]

### VII. *Front Pay*

269. Plaintiffs also sought an award of front pay. USS is not currently hiring laborers in its P & M department, and in fact, USS has laid off many employees. Hence offering class members jobs at this time is not a practical alternative.

270. Front pay

is an alternative to the traditional equitable remedy of reinstatement. *See White v. Carolina Paperboard Corp.,* 564 F.2d 1073, 1091 (4th Cir.1977). The choice of such a remedy in lieu of an order that the plaintiff be reinstated rests in the sound discretion of the trial court. *Dillon v. Coles,* 746 F.2d 998 (3d Cir.1984).

*Goss v. Exxon Office Systems Co.,* 747 F.2d 885, 890 (3d Cir.1984).

271. However, front pay "differs from a back pay allowance because it necessarily implicates a prediction about the future." *Dillon v. Coles,* 746 F.2d 998, 1006 (3d Cir.1984).

---

**3.** The final figure reflects a $2,000 increase over the total in Ex. P–238. The increase is a result of a computation error in the SUB benefits awarded. *Compare* Finding No. 165(a) *and* Ex. P–200 at 92, 95, 98, 100, 102 *with* Ex. P–239 at 3 (yearly SUB benefits inside USS provided for "all" P & M workers totals $824,946, not $822,-946).

**4.** *Goss, supra,* involved an individual sex discrimination suit. This Court awarded plaintiff

272. The Third Circuit has not yet addressed the issue squarely presented by this case, namely whether front pay is a remedy available to a Title VII class of unsuccessful applicants, where proof of both liability and damages were premised on statistics and averages, not on individual cases.[4]

273. Case law cited by the parties (from other circuits) supports an inference that front pay is available as a remedy for plaintiffs here. Nonetheless, I need not ultimately resolve the theoretical availability of front pay for plaintiffs, because assuming it were available, there is no evidence upon which I could reasonably conclude that plaintiffs are entitled to front pay. In an exercise of my discretion, I will not award plaintiffs any front pay, for the following reasons.

274. Plaintiffs concede that there is no way to determine how long it will take before USS begins hiring again. In all likelihood, USS will not resume hiring until at least 1990 or 1991.

275. Consequently, plaintiffs suggest an award of the mitigated wages for the years 1984 and 1985 (the two most recent years) as a reasonable "estimate" of front pay.

276. Plaintiffs did not lay any foundation for this conclusion. In stark contrast to the elaborate studies plaintiffs presented on their back pay calculations, for the front pay issue plaintiffs only presented a conclusory suggestion—pay the class two years worth of mitigated salary.

277. I agree with defendant that the proposed estimate is "sheer guesswork," and would require this Court to speculate wildly.

---

front pay for four months, based on evidence that this interim period was a reasonable estimate of the amount of time necessary for plaintiff to increase her earnings (based substantially on commissions) to her earnings level prior to defendant's discrimination. In *Dillon, supra,* another individual discrimination case, the Court of Appeals upheld the *denial* of a front pay award.

## VIII. *Tax Consequences of Damage Award*

278. Plaintiffs seek an unidentifiable additional amount of damages to counteract any adverse tax effect resulting from the lump sum damages award.

279. Plaintiffs produced no evidence nor any persuasive argument on this claim, and I will therefore not award further damages.

## IX. *Prejudgment Interest*

280. Although Title VII does not explicitly list prejudgment interest as an element of the available remedies, prevailing Title VII plaintiffs typically receive prejudgment interest. *See United States v. Lee Way Motor Freight, Inc.*, 625 F.2d 918, 940 (10th Cir.1979); *Pettway v. American Cast Iron Co.*, 494 F.2d 211, 263 (5th Cir.1974); *Davis v. Construction Materials, Division of Ancar Enterprises, Inc.*, 558 F.Supp. 697, 699 (N.D.Ala.), *aff'd mem.*, 720 F.2d 1293 (11th Cir.1983).

281. This additional component of damages is in accord with the "make whole" purpose of Title VII relief, since but for the discrimination, plaintiffs would have received the money several years ago. *Davis*, 558 F.Supp. at 699.

282. However, the decision whether to award prejudgment interest in a Title VII case is committed to the sound discretion of the trial court. *See, e.g., Taylor v. Philips Industries, Inc.*, 593 F.2d 783, 787 (7th Cir.1979).

283. Plaintiffs seek prejudgment interest for the mitigated back pay and fringes awarded to them.

284. Defendant contests granting any prejudgment award. As an alternative position, defendant argues that if any prejudgment interest is awarded it should not begin to run until July 1983, when the Court found defendant liable.

285. Were the sole consideration to make plaintiffs whole, I would be inclined to award plaintiffs interest from the date of the discriminatory act.

286. However, other equitable considerations temper my decision, and lead me to conclude that plaintiffs should be awarded prejudgment interest as of the date of the liability opinion (July 18, 1983). I arrive at this conclusion based on the following considerations.

287. As Judge Clemon in the Northern District of Alabama stated in the case of *Davis v. Construction Materials, supra*, 558 F.Supp. at 699–700:

> Prejudgment interest should ordinarily be awarded in Title VII cases, except in those instances where special circumstances would render such award unjust.

288. This is not a case of unjust enrichment. USS paid other individuals the wages and fringe benefits which they would have paid some of the members of the plaintiff class—the 386 persons who comprise the Black Hiring Shortfall. Thus, here defendant did not receive an economic advantage as a result of the discrimination.

289. This is not to say, as defendant argues, that unjust enrichment is a prerequisite to an award of prejudgment interest; rather, I am acknowledging the lack of economic benefit to defendant as a mitigating factor to be considered in fashioning an equitable remedy.

290. Next, in the liability opinion I specifically found that "plaintiffs have failed to make out a prima facie case of class-wide disparate treatment in violation of Title VII or intentional discrimination in violation of Title VII or intentional discrimination in violation of 42 U.S.C. § 1981." 570 F.Supp. at 277, Conclusion of Law No. 8.

291. I find that defendant's lack of *intentional* discrimination is another important mitigating factor in defendant's favor.

292. Moreover, plaintiffs' proof at both the liability phase and damages phase rested upon complex and sophisticated statistical analyses. Neither the liability decision nor the scope of damages could have been easily forecast by defendant.

293. In fact, cases from other circuits have gone so far as to find that when back

pay amounts are not easily ascertainable, prevailing Title VII plaintiffs may not be entitled to prejudgment interest. *See, e.g., Domingo v. New England Fish Co.,* 727 F.2d 1429, 1446 (9th Cir.1984) ("The fact that the amount of back pay is not easily ascertainable weighs against awarding prejudgment interest").

294. On balance, I find that plaintiffs are entitled to some extra compensation for not having the money they would have already received from USS, but for the discrimination. The prejudgment interest will further the "make whole" goal.

295. In an exercise of my discretion, I find the most equitable decision is to award plaintiffs prejudgment interest, to run from the date of liability (July 18, 1983), until the date of final judgment. *See Falcon v. General Telephone Co.,* 463 F.Supp. 315, 316 (N.D.Tex.1978), *aff'd in part, remanded in part on other grounds,* 626 F.2d 369 (5th Cir.1980), *vacated on other grounds,* 450 U.S. 1036, 101 S.Ct. 1752, 68 L.Ed.2d 234 (1981) (Title VII class action suit where the court calculated prejudgment interest from the date of the liability opinion until the date of final judgment).

296. The Third Circuit cases of *Goss v. Exxon Office Systems Co.,* 747 F.2d 885, 889 (3d Cir.1984) (court upheld, without comment, an award of prejudgment interest in individual Title VII case) and *Craig v. Y & Y Snacks, Inc.,* 721 F.2d 77, 82 (3d Cir.1983) (same), do not mandate another conclusion.

297. Prejudgment interest will be awarded using a fluctuating rate, pursuant to 26 U.S.C. § 6621 (the statute setting the interest charged or paid by the IRS on underpayments or overpayments of taxes), as adopted by courts in Title VII cases. *See EEOC (U.S.A.) v. Pacific Press, Publishing Ass'n,* 482 F.Supp. 1291, 1319–20 (N.D.Cal.1979), *aff'd,* 676 F.2d 1272 (9th Cir.1982); *EEOC v. Stone Container Corp.,* 548 F.Supp. 1098, 1108 (W.D.Mo. 1982); *Davis, supra,* 558 F.Supp. 697 (N.D. Ala.1983). This interest shall be compounded quarterly. *Pacific Press, supra,* 482 F.Supp. at 1320.

## X. *Injunctive Relief*

298. In the liability opinion, this Court found that USS employed mostly subjective criteria in its hiring practices, and that these subjective criteria were then used by untrained interviewers to hire laborers for the Fairless P & M department.

299. Specifically,

When making hiring decisions, USS's evidence was that its interviewers evaluated applicants using the following hiring criteria: education; work experience; attitude; initiative; personality; ability to take directions; alertness; intelligence; physical fitness (that is, physical restrictions); ability to communicate; military experience or training; vocational training; ability to meet work schedules; prior criminal record; familiarity with industrial or factory work; interest; prior employment history at Fairless Works; personal references; citizenship or alien status; having a relative in the USS work force; and age. Most of these criteria are wholly subjective. As to those criteria which can be objectively measured, such as education and work experience, USS employed no uniform system in assessing one applicant's qualifications vis-a-vis another's. Nor were the various interviewers and foremen trained in any way as to what the different criteria meant or how to implement them uniformly, although many of them are vague and all are subject to differing interpretations. (570 F.Supp. at 260, No. 39).

300. Preliminary interviews of applicants were conducted by an interviewer in the USS personnel department. The applicant was then interviewed by the foreman or general foreman of the operating department needing new employees. The foreman or general foreman had the authority to accept or reject the applicant. (570 F.Supp. at 259, No. 35).

301. "Although the USS Procedure for Uniform Employment Practices required all

interviewers to be trained, USS did not train its interviewers other than through on-the-job exposure to other interviewers' techniques. Nor did USS have any minimum education or work experience requirements for persons hired as interviewers." (570 F.Supp. at 260, No. 37).

302. In the absence of some directive from the Court, USS stated it has no intention of giving class members a hiring preference.

303. USS has no intention of advertising P & M job openings at Fairless Works and prefers to rely on word-of-mouth to fill openings.

304. USS has not adopted, nor does it plan to adopt, a policy to insure that blacks are hired in proportion to their percentage in the applicant pool.

305. Since the liability trial (three years) USS has not developed any new criteria for hiring P & M employees at Fairless. Moreover, USS has not, except for a hand dynamometer test, validated any of the selection criteria which have to this point been used at Fairless.

306. USS has neither validated nor prohibited use of the practice at Fairless of giving a preference to P & M applicants who have a relative at USS.

307. David W. Braithwaite, 30–year employee of USS and the Director of Corporate Employment since November 1, 1974, testified on behalf of defendant regarding matters concerning any need for injunctive relief.

308. Mr. Braithwaite testified that currently there are 2,786 active P & M employees at Fairless and 1,486 employees on layoff.

309. USS does not anticipate hiring for P & M positions at Fairless until 1990 or 1991.

310. When such hiring does begin, Mr. Braithwaite testified that USS will use the Pennsylvania Bureau of Employment Security (BES) as the *exclusive* source of candidates for labor positions.

311. USS has had only "very brief" discussions with BES regarding that agency's ability to act as the source of entry-level P & M referrals.

312. In answers to interrogatories, USS identified William J. Binkley, Staff Supervisor-Employment Benefits at Fairless, as one of the individuals who is responsible for administering, implementing and/or enforcing USS's recruitment and hiring plans. (Ex. P–207, No. 17).

313. Mr. Binkley has been in this position at Fairless for over a year now. Nonetheless, he has had no discussions with anyone at USS regarding the prospect of using the Bureau of Employment Security as the source of referrals for P & M positions.

314. In fact, as Mr. Braithwaite and Mr. Binkley testified, no one from USS has ever discussed with Mr. Binkley his "new" responsibilities for reviewing applications for the P & M department.

315. Apparently, because USS does not foresee hiring for P & M positions at Fairless until 1990 or 1991, Mr. Braithwaite does not view training or preparation of those who will oversee or interview necessary at this time.

316. I am dismayed by this seemingly lackadasical attitude, given this Court's liability findings on the subjective nature of the hiring tests, compounded by the unfettered exercise of control by the interviewers.

317. To ensure USS's compliance with its obligations under Title VII in general, and this Court's liability findings in particular, an injunction is warranted and appropriate, notwithstanding USS's beginning efforts at changing their hiring practices. *Taylor v. Teletype Corp.*, 648 F.2d 1129, 1135 (8th Cir.) ("once discrimination has been established in a Title VII action, the issuance of an injunction rests in the sound discretion of the district court, even if the employer has begun to comply with the law in good faith"), *cert. denied*, 454 U.S. 969, 102 S.Ct. 515, 70 L.Ed.2d 386 (1981).

318. Plaintiffs seek several forms of injunctive relief—invalidation of hiring criteria, extensive communication and publication of job opportunities, centralized interviewing, records retention, compliance reporting, proportionate black hiring and hiring preferences.

319. All, save the final two—proportionate black hiring and hiring preferences—will be included in the permanent injunction order.

320. The granted injunctive relief goes to the heart of this Court's liability findings—namely, that USS used subjective criteria, applied by untrained interviewers with unchecked authority, to hire P & M workers at the Fairless plant. These practices, in combination, had a significant discriminatory impact on black applicants.

321. As a corollary to this subjective, haphazard hiring procedure, I found that USS destroyed thousands of the applications from the earlier liability periods.

322. Thus, injunctive relief directed at correction of the discriminatory hiring practices and procedures is a completely appropriate remedy. The validation, centralization, publication and record-keeping aspects of the injunction are all aimed at correcting the discriminatory practices found here. To the extent these practices also aid black individuals who were not members of the class, such a result is permitted under the very recent Supreme Court case of *Sheet Metal Workers v. EEOC*, —— U.S. ——, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986).

323. As for the race-conscious elements of the injunctive relief sought by plaintiffs, in the exercise of my discretion I decline to order hiring goals or other numerical or percentage affirmative action plans, for the reasons enumerated below.

324. First, in the liability opinion this Court did not find any evidence of bad faith, intentional discrimination, or classwide discrimination.

325. While it is true that the practices resulting in a discriminatory impact continued over a substantial period of time, the discrimination was based on an honest if misguided belief, that USS was not discriminating against blacks in general, and in particular, against black applicants at the P & M division of the Fairless plant.

326. Next, race-conscious affirmative measures in this case would "unnecessarily trammel" the rights of the current inactive USS P & M workers (1,486 individuals) who, as USS workers on layoff, have recall rights for 5 years. *See United Steelworkers v. Weber*, 443 U.S. 193, 208, 99 S.Ct. 2721, 2730, 61 L.Ed.2d 480 (1979). This union-negotiated contract right is a bona fide seniority-like arrangement, not the result of any discriminatory practices by USS. *See Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984) (Court held that district court could not modify a consent decree, entered without a finding of intentional discrimination, in such a manner as to override a bona fide seniority system). Post-*Stotts*, the Third Circuit has limited the decision to its facts. *See Pennsylvania v. International Union of Operating Engineers*, 770 F.2d 1068, 38 Fair Emp. Prac.Cas. (BNA) 673 (3d Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 803, 88 L.Ed.2d 779 (1986); *Kromnik v. School Dist. of Philadelphia*, 739 F.2d 894 (3d Cir.1984), *cert. denied*, 469 U.S. 1107, 105 S.Ct. 782, 83 L.Ed.2d 777 (1985). Similarly, there is also a legitimate contract right to transfer within USS before looking outside the company.

327. Moreover, the injunctive relief granted, in combination with the monetary relief, should make plaintiffs whole, as well as prospectively ensure qualified black applicants access to the Fairless Hills P & M division. To go further at this stage would go beyond the scope of the liability opinion.

328. In addition, because USS will not, in all likelihood, resume hiring until 1990 at the earliest, no interim hiring goal is necessary to immediately safeguard against the use of subjective criteria.

329. In the *Sheet Metal Workers* case, the Supreme Court noted that race-conscious hiring is still the exception, and not

the rule. —— U.S. ——, 106 S.Ct. at 3050. The Supreme Court cautioned that a court should

> take care to tailor its orders to fit the nature of the violation it seeks to correct. *Id.* at —— - ——, 106 S.Ct. at 3050–3051.[48]

[48] "While the circuit courts of appeals have indicated that they possess [the] power [to award race-conscious affirmative relief], they have been reluctant to exercise it. The federal appellate courts have preferred to issue less harsh orders such as recruiting and posting of notices of vacancies. They have tended to impose hiring orders only after employer recalcitrance has been demonstrated." Blumrosen, 34 Rutgers L.Rev., at 41. See also Edwards & Zaretsky, Preferential Remedies for Employment Discrimination, 74 Mich.L.Rev. 1, 6–7 (1975).

## XI. *Costs*

330. USS shall bear the costs of distributing notice of the Court's opinions and damages to the class members. Counsel shall agree on the method and wording of the notice within 30 days from the date of this opinion. *Pennsylvania v. Local 542, International Union of Operating Engineers*, 502 F.Supp. 7, 16 (E.D.Pa.1979) (Title VII class action alleging race discrimination), *aff'd mem.*, 648 F.2d 922 (3d Cir. 1981) (en banc).

331. Within a reasonable time period (agreed upon by counsel), after due notice has been completed, the class shall be closed.

332. Counsel shall thereafter arrange for *prompt* distribution of damages to the identified class members.

## CONCLUSIONS OF LAW

1. Unsuccessful applicants for summer positions are included in the class of plaintiffs.

2. The decertification notice sent in connection with *Dickerson v. United States Steel Corp.*, 13 Empl.Prac.Dec. (CCH) ¶ 11,311 (1976), did not preclude unsuccessful applicants for P & M jobs in 1972, 1973 and 1974 from recovering damages in this case.

3. The proper group of USS employees to refer to when measuring what class members would have earned at USS, had they been hired, is all the P & M employees USS did hire in place of the class members.

4. USS is not entitled to a credit against damages for the two years (1975 and 1976) in which it consciously hired blacks. in excess of their proportion in the applicant pool. 570 F.Supp. at 261 (No. 52), 276–77.

5. USS is not entitled to a credit against its damages for years in which the outside wages of members of any year class exceeded the gross wages that they would have earned at USS. Outside wages were calculated on a year-by-year basis. When outside wages exceed USS wages, the result is that the plaintiffs suffered no damages that year. Those earnings do not reduce damages otherwise due.

6. Plaintiffs are entitled to mitigated back pay in the amount of $7,721,755. (Ex. P–238).

7. Plaintiffs are entitled to damages for lost fringe benefits. Those fringe benefits for which damages shall be awarded are insurance, including life insurance, hospitalization, physicians' services, major medical, sickness and accident, dental and vision, and pension, workers' compensation, unemployment compensation, FICA and Supplemental Unemployment Benefits (SUB). The amount of mitigated fringe benefits to which plaintiffs are entitled is $4,676,173. Plaintiffs total damages for back pay are $12,397,928.

8. Plaintiffs have failed to prove with sufficient specificity that they are entitled to an award of front pay to compensate them for economic losses they may continue to suffer after the date of this judgment.

9. Plaintiffs are entitled to an award of prejudgment interest, computed for each year class from the time that defendant was found liable. The rate of interest to be applied shall be that which was prescribed from time to time by the Internal Revenue Service in 26 U.S.C. § 6621. Interest shall be compounded quarterly from July 18, 1983 until the date of this award.

10. Plaintiffs are entitled to an award of post-judgment interest at the federal

statutory rate from the date of this award until the judgment is satisfied.

11. Plaintiffs are entitled to injunctive relief, the terms of which are set forth in the accompanying Order.

## PERMANENT INJUNCTION

On July 18, 1983, this Court found defendant United States Steel Corporation (USS) in violation of Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. § 2000e *et seq.*), for engaging in race discrimination against a class of black persons who unsuccessfully sought entry-level labor employment in the production and maintenance (P & M) department of USS's Fairless Hills, Pennsylvania plant at any time between July 11, 1972 and December 31, 1974, and between January 1, 1978 and December 31, 1979. *Green v. United States Steel Corp.*, 570 F.Supp. 254 (E.D. Pa.1983). This Court has determined that the entry of a permanent injunction is necessary to ensure USS's compliance with Title VII.

NOW, THEREFORE, IT IS HEREBY ORDERED as follows:

1. *Definition*—For purposes of this injunction, the following definition shall apply: "P & M" refers to the Production and Maintenance department of the USS facility in Fairless Hills, Pennsylvania and excludes Trenton hires, nurses, plant guards, trade and craft hires, and clerical and technical hires.

2. *General injunction*—USS, its directors, officers, managerial and supervisory employees, successors and assigns, and those acting on behalf of USS in employment matters are permanently enjoined and restrained from (i) discriminating in any aspect of employment on the basis of race, color, or national origin with respect to P & M labor hiring; (ii) refusing or failing to fully implement, or to participate and cooperate in the implementation of, the provisions set forth in this decree; and (iii) discriminating or retaliating in any manner against any applicant or employee because of the filing of a charge, the giving of testimony or assistance, or the participation in any manner in an investigation, proceeding or hearing under Title VII or any other anti-discrimination law or ordinance.

3. *Announcements of job openings* —In order to ensure that minorities receive proper notification of future employment opportunities at the Fairless Hills facility, USS shall take reasonable steps to publicize P & M labor job openings through *e.g.*, advertisements in the help-wanted sections of newspapers in the Philadelphia, Pennsylvania and Trenton, New Jersey areas oriented toward the minority community, notices to local minority groups and submission of announcements to radio stations in the Philadelphia and Trenton areas.

4. *Employment selection criteria* —USS shall not use subjective employee selection criteria when filling P & M labor positions unless such criteria have been validated in accordance with the Equal Employment Opportunity Commission's "Uniform Guidelines on Employee Selection Procedures 1978," 29 C.F.R. §§ 1607.1— 1607.18 (1985), or unless USS can establish that such procedures have no disparate impact on minorities.

5. *Centralized hiring*—To ensure that USS's employment practices are properly implemented, P & M labor hiring decisions shall be made by employees in the Personnel Department who have received periodic instruction on the proper application of non-discriminatory USS hiring practices.

6. *Records*—USS shall maintain the following records for at least five years after they are created:

(a) All applications for P & M labor positions in the P & M category;

(b) All job application logs prepared by USS with respect to P & M labor positions;

(c) Monthly summaries of the racial composition of the P & M applicant pool;

(d) Monthly summaries, by race, of USS's hiring for P & M positions;

(e) All EEO-1 forms and other documents pertaining in whole or in part to P & M labor positions submitted to the EEOC, the Office of Federal Contract Compliance, the Pennsylvania Human Relations Commission, and the New Jersey Depart-

ment of Law and Public Safety, Division on Civil Rights;

(f) All documents pertaining to any test or other selection criteria used by USS to select applicants for P & M labor positions; and

(g) Documents used in or reflecting the periodic training on non-discriminatory hiring given to USS personnel with responsibility for P & M labor hiring.

7. *Reports*—When respect to P & M labor positions, USS shall furnish to the Court and plaintiffs' counsel on or before March 1 of each year a written report containing at least the following information about the preceding calendar year (to the extent applicable, in a given year):

(a) USS's employment selection criteria:

(1) Copies of any written tests used during the reporting year. If a selection procedure other than a written test is employed, include a written description of the procedure;

(2) The pass/fail rates, or other results obtained from the written test or other selection procedure, broken down by race, during the reporting year; and

(3) All validation studies or other data demonstrating the job relatedness, or lack thereof, of the USS employment practices used during the reporting year. If no studies or other data exist, that fact shall be stated and USS shall prepare and submit a timetable for obtaining such studies or data.

(b) Minority applications and hiring:

(1) Information, broken down by race, regarding the number of applications submitted and the number of persons hired for P & M labor positions during the reporting year;

(2) Copies of all notices sent (pursuant to paragraph 3 of this injunction) to newspapers, radio stations, minority groups, and employment agencies (including the Bureau of Employment Security) announcing P & M labor job openings.

(c) Hiring personnel:

(1) The name and title of all persons who during the reporting year had authority to make hiring decisions for P & M labor positions and the names of all persons who were responsible for implementing USS's employment practices;

(2) A description of the instruction and training provided during the reporting year to each person listed in subparagraph (c)(1) with respect to the meaning and application of this injunction and non-discriminatory hiring policies; and

(3) The name and title of the person designated by USS to be responsible for its compliance with the terms of this injunction.

(d) USS shall furnish these yearly reports through 1996, at which time, upon petition by USS and based upon an appropriate review of the status of the case at that date, the Court will determine whether further reporting is necessary.

8. *Continuing jurisdiction*—This Court shall retain jurisdiction over this action to ensure USS's compliance with the terms of this permanent injunction.

AND IT IS ORDERED.